97    651
a196s 580

## City of Chicago v. The Norton Milling Co.

1. INDEPENDENT CONTRACTORS—*Non-Liability of Their Principals for Their Negligence—Application of the Doctrine.*—The doctrine of independent contractors and the non-liability of a principal for their negligence, is never applied to absolve one from liability for the doing of that which he has directly authorized or which necessarily results from the doing of that which he has contracted or directed to have done.

2. MUNICIPAL CORPORATIONS—*Liability for Damages Done by Contractors.*—Where a city authorizes a public work to be done and in the doing of it the premises of a citizen are damaged, either by reason of the negligence of the contractors or as a necessary or natural consequence of the doing of that which it employed them to do, the city is liable for such damage, unless it has done that which it had not only the right to do but to do it in the manner it did it.

3. SAME—*Liability When Acting Judicially and When Ministerially.* —A municipal corporation in planning a public work acts judicially, and when proceeding in good faith, is not liable for errors of judgment; while in constructing the work it acts ministerially and is bound to see that it is done in a reasonably safe and skillful manner.

4. SAME—*When Estopped to Raise the Question of Ultra Vires.*— Where a public work done, is within the power of a municipal corporation, it may be estopped to raise the defense of *ultra vires*, notwithstanding there has been a failure to comply with some regulation concerning the exercise of such power.

5. SAME—*Liability for Torts Not Affected by Constitutional Inhibition.*—The liability of a municipal corporation for its torts, is not affected by the constitutional inhibition as to its indebtedness.

6. SAME—*When Liable in Tort.*—Where a municipal corporation directs and superintends the construction of a public work, and it is negligently done, and thereby the property of a citizen is injured, the corporation is liable for such injury, in an action of tort.

7. SAME—*When Estopped to Question a Contract, Invalid from Its Inception.*—Where a contract entered into by a municipal corporation is within its powers and apparently advantageous to it, though invalid from its inception, if the corporation has received the benefit of it, it will be estopped from questioning it.

8. EVIDENCE—*Of Money Expended in Repairing Property Injured— Requisites of the Remedy.*—In an action against a city for damages resulting from injuries to property by reason of the construction of public works, there is no rule of law which forbids a party to testify as to payments made by him to repair such injury; but whether he is entitled to recover for such payments depends upon whether such repairs were rendered necessary by what was done by the city and whether the amount paid was reasonable.

9. RENTS—*For Spaces Under Sidewalks.*—In all great cities there are many excavations beneath the surface of the streets, occupied by private individuals for private purposes with the knowledge and assent of the municipal authorities, but the court is aware of no authority holding that such cities may at any time, in actions for use and occupation, collect from these occupiers the rental value of the spaces so occupied.

Assumpsit, on a contract in writing. Appeal from the Circuit Court of Cook County; the Hon. JOHN GIBBONS, Judge, presiding. Heard in the Branch Appellate Court at the October term, 1900. Affirmed. Opinion filed November 1, 1901.

Statement.—The City of Chicago, appellant in this court, and defendant in the Circuit Court, by its city council, passed an ordinance, June 8, 1887, for the condemnation of a strip off the east side of the dock of the Norton Milling Company, appellee, "for the purpose of widening the south branch of the Chicago river, north of and adjoining West Madison street," as in said ordinance expressed. The strip to be condemned was ten feet wide at the edge of the street, and tapered off to a point about eighty feet north on the dock, and comprising about 259 square feet. The corporation counsel was ordered to file a petition in the Superior Court, and to submit the question of compensation to be paid to a jury. Subsequently, in the annual appropriation bill of 1889, the city council incorporated this provision:

"A NEW BRIDGE AT MADISON STREET.

For a new bridge at Madison street.....$200,000
Less cash from miscellaneous sources.... 200,000."

On the sixth day of April, 1889, the corporation counsel filed in the Superior Court a petition for condemnation, under the said ordinance of 1887.

On the thirteenth day of April, 1889, the corporation counsel went into court with the Norton Milling Company and dismissed the petition as to all of the said strip of land, except six and one-half feet in width at the south end, and running to a point on the east line of said dock, about seventy-five or eighty feet to the north. The petition as it then stood called for a condemnation of less than 149 square feet, or less than one-half of the amount ordered to be con-

demned by the ordinance; the milling company having entered its appearance and waived a jury, the city and the Norton Milling Company agreed to a finding and judgment against the city for $10,290, as for condemnation for the land condemned. This sum was paid to the milling company.

On the same thirteenth day of April, 1889, the city, through the mayor and commissioner of public works of the city, made a contract with the milling company in which, by its terms, the plaintiff agreed to permit the city to swing its new bridge around over a small corner of the three and one-half feet of the dock outside of a distance of two feet from the southeast corner of the mill. It was also substantially provided in the contract that the plaintiff should submit without complaint, to the annoyance and inconvenience to its business, during the construction of the bridge and abutment. As a consideration for this, the city agreed to excavate a large space under Madison street, at its own expense, and for the benefit of the plaintiff, and give it rent free to the plaintiff, so long as the bridge swings around over the segment of the dock. This easement consisted of the swinging of the bridge over about seven square feet of the corner, and at a height of ten feet above its surface.

The city agreed to indemnify and save harmless the plaintiff from all injury or damages from the change of line of the dock, or the operation of the city in constructing a new dock, and also agreed to construct such new dock similar and equal in character and construction to the then existing dock, and agreed that in constructing the same, it would provide, by driving piles, or otherwise, suitable and adequate protection, satisfactory to the milling company, from vessels, for the fly-wheel of the engine then "projecting through the east wall of said mill building." John A. Roche was then mayor, and George B. Swift was commissioner of public works.

On the same day, it is claimed by appellant, without advertisements for bids, and without competitive bidding, or letting to the lowest bidder, the city, through the mayor

and commissioner of public works, made contracts for the construction of the bridge, abutments and center pier, though it does not appear that any contract was ever made for the construction of the new dock, with the portion cut off, according to the condemnation, while the plans produced by the engineer, Mr. Riter, makes no reference to any such work. One of these contracts was made with Riter & Conley for the construction of the bridge, and the other one with the Fitzsimmons & Connell Company, for the construction of the center pier and the abutments. This being done, everything lay in abeyance until the spring of 1891, two years subsequent.

In the spring of 1891, the contractors who had secured these contracts proceeded to build the bridge, center piers and abutments, and at the same time constructed a new dock east of the plaintiff's mill, and widened the river at that point to the extent of taking off from the old dock about five feet of the strip condemned. Also, at the same time, the Fitzsimmons & Connell Company excavated the space under Madison street, provided in the contract of the city with the plaintiff. The whole work was completed and the bridge opened for traffic October 16, 1891.

It was claimed by the plaintiff that the work of taking out the old west abutment of the Madison street bridge, and reconstructing the new abutment, excavating the space under Madison street and constructing the new dock, injured its building by causing the same to settle and crack, and that it has thus wrenched the building out of shape, and that the damage has amounted to a large sum of money. The defendant claimed that all of the contracts were invalid. The plaintiff brought the present action against the city on the 28th day of April, 1892, about six months after the work was completed. The pleadings are in substance as follows:

The plaintiff's declaration is in assumpsit and is based upon the contract of the city with it.

Defendant filed the plea of general issue, and subsequently other pleas, claiming that all the contracts were

invalid because the city council at the time of the making of the contract had not made any appropriation of moneys or ordered any fund for the payment of the moneys promised to be paid as alleged in the said declaration, because the city was indebted in excess of five per cent of the value of the taxable property therein at the time of the making of said supposed contract. There was also filed a plea of set-off, for $25,000, for rent of the space under Madison street, due to the city and unpaid, etc., and afterward a plea of entire want of consideration for the alleged contract sued on.

Charles M. Walker, Corporation Counsel, and Thomas J. Sutherland, attorneys for appellant.

Francis W. Walker and Byron Boyden, attorneys for appellee.

Mr. Justice Waterman delivered the opinion of the court.

Appellant insists that no recovery could properly be had by appellee in this declaration, because not only was the contract of appellee with appellant, but the contracts of the city with Riter & Conley and with the Fitzsimmons & Connell Company were each invalid, not being authorized by proper proceedings of the city council or by proper advertisement and award. For the purposes of this case at this juncture, we do not regard it as of vital importance whether either or all of the aforesaid contracts were or was valid and binding at its or their inception. The erection of a new, wider, and larger bridge at Madison street, was a thing which had been discussed by the city council and officers of the municipality for years. The doing of the work was a desirable and legitimate thing on the part of the city, and one within its powers. What was done by the city officers was not hastily entered upon. The matter had been under consideration and steps taken toward the work for years. Finally, to accomplish the end in view the city instituted against appellee condemnation proceedings, following which an agreement was arrived at, judgment for condemnation

entered in open court, and an award of over $10,000 paid to appellee. Thereafter, the city, through its mayor and commissioner of public works, made a contract with appellee by which it acquired the right to use certain property of the Norton Milling Company for the necessary swinging of the said bridge, and after this, in the same way and through the same agents, the city made contracts with two contractors for doing certain work necessary for the construction of such bridge; thereupon the contractors, by the direction of the city and under the superintendence of city engineers, entered upon the performance of their contracts, but in so doing, as is claimed by appellee and as was found by court and jury in the trial below, the premises of appellee were greatly damaged, which damage was found by the trial court to amount to over $10,000, for which appellee has recovered the judgment from which the appeal in this case was taken. So much is substantially undisputed.

The doctrine of independent contractors and the non-liability of a principal for their negligence, is never applied to absolve one from liability for the doing of that which he has directly authorized, or which necessarily resulted from the doing of that which the principal contracted or directed to have done.

In the present case it does not appear that the contractors did any work which they were not authorized to do by the city. What appears is, that in the doing of such work the premises of appellee were damaged, either by reason of the negligence of the contractors, or as a necessary or natural consequence of the doing of that which the city employed them to do. Such being the case the city is liable to appellee for such damage, whether its contract with appellee was valid or otherwise, unless the city has done that which it had a right not only to do, but to do in the manner it did.

If the contract of appellant with appellee is void and of no effect, then the city, in swinging the bridge over the premises of appellee, has been for some eight years a trespasser, and if it did the work in a negligent manner, it is liable for the consequences of its negligence.

If the contract is valid, then the city is liable because therein it directly promised to protect and indemnify appellee against all damages to its building or the contents thereof, which might result from the change of dock landing or its operations, or the operations of said city, its agents, contractors or employes, in the construction of a new dock, and that it would provide, by driving piles and sheeting, or otherwise suitable and adequate protection from vessels satisfactory to appellee, for the fly-wheel of the engine then projecting through the east wall of appellee's building.

A municipal corporation in planning a public work acts judicially, and proceeding in good faith, is not liable for errors of judgment; while in constructing public works it acts ministerially, and is bound to see that the work is done in a reasonably safe and skillful manner.

If the work done was within its power it may be estopped to raise the defense of *ultra vires*, notwithstanding there has been a failure to comply with some regulation concerning the exercise of the power. National Home Building & Loan Association v. Home Savings Bank, 181 Ill. 35; Goodrich et al. v. City of Chicago, 20 Ill. 445–448; Chicago v. Seben, 165 Ill. 371–378–382; Dillon on Municipal Corporations, Sec. 1047, 1048–1050; Ashley v. Port Huron, 35 Mich. 296; Nevins v. Peoria, 41 Ill. 502; Seifert v. Brooklyn, 101 N. Y. 136; Robbins v. Chicago, 4 Wall. 657–679; Tiffin v. McCormack, 34 Ohio St. 638; Dillon on Municipal Corporations, Sec. 1029 to 1034; 1st Ed., Am. & Eng. Ency. of Law, Vol. 15, 1080–1102; Badger v. Inlet Drainage District, 141 Ill. 540–549.

Whether the city at the time of the making of such contracts, the entering upon the property of appellee, and doing the work heretofore mentioned, was indebted in excess of five per cent of the value of the taxable property therein, we do not consider material.

The Supreme Court of this State has repeatedly held that the liability of municipalities for torts is not affected by constitutional inhibition as to indebtedness.    City of

Bloomington v. Perdue, 99 Ill. 329–333; City of Chicago v. Sexton, 115 Ill. 230–245.

While in The City of Chicago v. Cement Company, 178 Ill. 372, 385, the Supreme Court, in an action brought under the statutes to recover damages for property destroyed by a mob, said—

"Whether or not the city of Chicago was, at the bringing of this suit, indebted beyond that amount, is wholly immaterial in determining the constitutionality of the law. That question could only arise, if at all, upon a proceeding to collect the judgment"—

we see no reason why appellee might not have brought an action of tort for the damages it claims, without there having been any contract between it and the city. Having, at least, a form of contract by which the city agreed to indemnify it against certain damages, both parties having evidently understood that they had entered into a valid contract, each having acted thereon and the city having derived benefit therefrom, the present action of assumpsit can be maintained.

The contracts made by the city with each of the contractors for the work, provided that all of the work should be done " under the immediate direction and supervision of the commissioner of public works of the city of Chicago and to his entire satisfaction, approval and acceptance."

It appeared that the construction of the new dock was carried on under the direction and supervision of an engineer of the city, Mr. Murphy; that much extra work, as driving of piles, and tying the dock with rods tied to the building, was done because of and by the order of this engineer.

We think the evidence warranted the jury in finding that the city directed and superintended the construction of the new dock, so that if the work was negligently done and thereby appellee was injured, the city is liable therefor in an action of tort. Dillon on Municipal Corporations, 4th Ed., Secs. 965, 966, 983, 984, 1050; Hannon v. St. Louis Co., 62 Mo. 313; Hill v. Boston, 122 Mass. 344; Addison on Torts, 725–727.

We regard the contract of appellant with appellee as one which, if invalid at its inception, the city is now estopped from questioning. For some eight years the city has been enjoying the benefit of this contract; at the beginning of this suit, during the trial, since the judgment and now, the city was and is using the land, an easement in which was given to it by its agreement with appellee. The contract was within its powers and apparently one advantageous to it. To this day appellant has not, so far as appears, offered to relinquish the right acquired thereunder, but appears in this court clinging to the advantage it thus obtained while endeavoring to escape fulfillment of the obligation it gave by insisting that the contract is invalid. It can not now disaffirm the act of agents which for many years it has ratified. Connett v. Chicago, 114 Ill. 233; Shawneetown v. Baker, 85 Ill. 563; Town of Petersburg v. Mappin, 14 Ill. 193–195; Town of New Athens v. Thomas, 82 Ill. 259; Dillon on Municipal Corporations, 4th Ed., Secs. 477, 478–459 and 966; Am. and Eng. Ency. of Law, Vol. 27, p. 366, note 4, and p. 377; same, Vol. 15, p. 1080, note 3; same, Vol. 15, p. 1106, note 3; same, Vol. 15, p. 1081-2, notes 1 and 4.

Appellant urges that the Circuit Court erred in permitting Edmund Norton to testify that he called the attention of city engineers Clark and Murphy to the condition of the Norton Milling Company's building and as to what they did in regard to the building afterward.

It appeared that Murphy and Clark were engineers employed by the city, who supervised and directed the building of the dock, approaches to, and certain piers for the Madison street bridge. Such being the case, it was natural and proper that Mr. Norton should speak to them concerning the condition of the building and the effect which the city's work, especially the construction of the new dock, was having upon it, and any notice which Norton gave to these engineers in this regard, was notice to the city's representatives in this matter and consequently to the city. It was not necessary, in order to give notice to the city of what effect the work was having upon the mill building, to hunt

up the mayor, or the commissioner of public works, and tell them about it, or to go before the common council and make representations to it. Whether what Clark and Murphy thereafter did, was admissible in evidence, depended upon whether their action in this regard was in the line of their employment by and duty to the city.

It is also urged that the court erred in permitting Edmund Norton to testify as to what moneys the plaintiff had paid out to repair damage to the building alleged to have been caused by the construction of the new dock; it being insisted, among other things, by appellant, that he could not testify unless he produced vouchers for the payment.

We are not aware of any rule, that in such a case as this, forbids a party to testify as to payments made by him, and whether he has or has not, vouchers for the same. Whether he would be entitled to recover such payments would depend upon whether the repairs were rendered necessary by what the defendant did, and the amount paid therefor was reasonable. As to repairs which he had made and paid for, the plaintiff would not be entitled to recover more than a reasonable sum, and in no event more than it had actually paid, or become obligated to pay. It was therefore proper that he should testify as to the amount actually paid.

It is urged by appellant that the court erred in permitting Mr. Frazer to testify which of certain machinery was the heavier. If he knew as to this, we see no reason why he might not testify as to his knowledge; he being, as was shown, an expert as to the machinery under consideration, we think it was proper to admit his testimony as to its weight.

It is also urged by appellant that the court erred in permitting Mr. Frazer to testify as to the necessity for taking the old machinery out of the mill in order to make the machinery run; and the comparative cost of taking the old machinery out or leaving it in; and as to what it would cost to take out the old machinery from the mill and put it back; and as to this counsel for appellant make the follow-

ing comment: "This testimony of the witness Frazer, was so rank as to greatly test the patience of any lawyer."

In jury trials, the patience of lawyers is not infrequently tested by the evidence of adverse witnesses. Counsel find that witnesses called by the opposite party often testify to that which he would gladly keep out, and which it is painful for him to listen to. As has before been stated, Mr. Frazer was an expert as to milling machinery, and the testimony given by him, of which counsel complains, was proper, as showing the situation in which plaintiffs were placed by the damage done to their mill and the changes in machinery which they were obliged to make.

Appellant also urges that the court erred in refusing to strike out the testimony of Messrs. Wells, Smith and Prussing as to the dredging of the Chicago river, in and about the construction of a certain pier of the bridge and as to the effect of such dredging upon the dock adjacent to the building of the plaintiff, and that the court also erred in not sustaining the objections of the defendant's counsel to the testimony as to such machinery, as to the work at a certain pier, and of the work in Madison street, and in and about the taking out of the old north abutment and the placing of the new abutment.

It appeared that all the work done in and about preparing a pier upon which the Madison street bridge could rest, room for it to swing and approaches thereto, was done by the direction, under the supervision and management of the city. Each part of the work was related to all the rest. And while it is true that appellant's contract covered damages done from only a portion of the work, it was hardly possible to give the jury an intelligent understanding of what was done in the construction of the new dock, without describing much that was done upon the premises adjacent, near to, and upon work intimately related to the new dock.

The contract provided that appellant, before taking possession of the strip of land it had condemned or disturbing appellee in the occupation of such condemned land or

of its boiler room as then located, would excavate the north half of that portion of Madison street extending from the Chicago river to West Water street, to the limit of the boiler room as then located, and would inclose by proper walls the space so made, and appellant did in and by such contract, then give to appellee the use of said north half of Madison street, free of rent, for so long a time as the city of Chicago had or might acquire power to give or grant.

The testimony, for the purpose for which it was given, was properly received.

Appellant also urges that witness should not have been permitted to testify that the building had settled. If the settling of a building is apparent to the eye, we see no reason why a witness may not testify as to what he has seen in that regard and also as to the progress of the settling.

Appellant also urges that the court erred in permitting "Wells, Prussing and Smith" to testify as to the probability of further settling of the building. Mr. Smith testified as an expert engineer, by long experience and much observation, familiar with the subject concerning which he gave evidence.

Appellant also urges that the engineer, William Sooy Smith, ought not to have been permitted to testify as to whether the foundations under plaintiff's building were, up to 1891, sufficient to carry the weight and load of the building, assuming that up to that time there had been no appreciable settlement of the building. Testifying as he did, as an expert, concerning a subject with which he was familiar and had made examination, the evidence given by him in this regard was properly received.

Appellant also urges that the court erred in not permitting the defendant to introduce testimony as to the rental value of the vacant space under Madison street, excavated under the contract by the city, and under the same agreement since occupied by the plaintiff. This contention is based upon appellant's claim that the contract between appellant and appellee was void in its inception and has ever been

invalid. Admitting the contention of appellant in this regard (and we may say) that if the city should cease to swing its bridge over a portion of appellee's premises, it is questionable whether appellee could maintain this claim to the exclusive use and occupancy of the portion of Madison street under the surface. Nevertheless we are not prepared to hold that merely because the plaintiff with the consent of the city has occupied a portion of a street beneath the surface, without paying rent, under an understanding with the city that it might do so, it is liable to the city in an action for use and occupation and for the rental value of such premises, although the agreement under which it has occupied them should be held to be invalid.

In every great city there are many excavations beneath the surface of the streets, occupied with the knowledge and assent of the city for private purposes. This practice has continued for many years and we are aware of no authority holding that the city may at any time, in actions for use and occupation, collect of these occupiers the rental value of the space so occupied. So, above the surface of the street in all large cities, there are very many basements and upper story steps, railings, awnings, signs, windows and other projections into the street, placed there and occupied by private persons for their own purposes.

That all these individuals are liable to the city for the rental value of that portion of the street they have so occupied, we have never understood. That where vested rights to such occupancy have not been acquired, the city may, when public interest demands, terminate the right, we have no doubt. The subject is discussed to some extent in the 4th edition of Dillon on Municipal Corporations at section 660.

The court properly refused to admit the evidence offered by appellee.

We have examined the instructions given at the instance of the plaintiff and those offered by the defendant, which were either modified or refused, and also the objections

of appellant to the action of the court in this regard, and find no error therein warranting a reversal of the judgment entered in this cause.

The evidence in this case was extensive and the record is voluminous.

The trial court seems to have carefully considered the very numerous objections raised by appellant and to have earnestly endeavored to give to it every right to which it was entitled.

The evidence clearly warranted the verdict of the jury. The judgment of the court seems to be just and it is affirmed.